IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JAMES KATTERMAN,<br><br>               Plaintiff,<br><br>    vs.<br><br>SALT LAKE COUNTY, POLICE CHIEF JAMES D. WINDER, KEVIN S. BARRETT, OFFICER KYLE GLEUE, OFFICER JARED ANGELL, UNIFIED POLICE DEPARTMENT OF GREATER SALT LAKE, also known as or functioning as SALT LAKE COUNTY SHERIFF, and JOHN DOES 1-15,<br><br>          Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**Case No.  2:13-cv-1122-EJF**<br><br>**Magistrate Judge Evelyn J. Furse** |

## I.   INTRODUCTION

Defendants Jared Angell (Officer Angell), Kevin S. Barrett (Officer Barrett),[1] Kyle Gleue (Officer Gleue), Salt Lake County, Unified Police Department of Greater Salt Lake (UPD), and James D. Winder (Chief Winder) move for Summary Judgment.[2] (Defs.' Mot. for Summ. J. & Supp. Mem. (Mot.), ECF No. 55.)  Mr. Katterman's original Complaint contains twenty causes of action, including 42 U.S.C. § 1983 constitutional claims, common law claims, statutory claims, and claims based upon the Utah Constitution.  (Compl. 2, ECF No. 2.)  The parties agreed to dismiss the Sixth, Ninth, Tenth, Twelfth, Fourteenth, Fifteenth, Sixteenth, and Seventeenth Causes of Action.  (Order Granting Stipulated Mot. to Dismiss Certain Claims, ECF No. 72.)  The parties also agree that no common law claim for negligent failure to investigate

---

[1] Officer Barrett has become a Detective in the years since this case began.  (Lovato Dep. 12, ECF No. 57-3.)  The Court will refer to Detective Barrett as Officer Barrett for this Motion to avoid confusion about his role at the time.
[2] The parties have consented to jurisdiction by the undersigned Magistrate Judge.  (ECF No. 11.)

exists.  (Pl.s' Mem. in Opp'n to Defs.' Mot. for Summ. J. (Opp'n) xlvi-xlvii, ECF No. 57),

therefore, the Court dismisses the Eighth Cause of Action with prejudice.  Mr. Katterman

abandoned his failure to train claim against UPD by not putting forth any argument in defense of

it in his Opposition to Summary Judgment.  Additionally, Mr. Katterman's counsel, at oral

argument, agreed the Eleventh Cause of Action should merge into the Eighteenth Cause of

Action for vicarious liability under § 1983.  Thus, the Court DISMISSES Mr. Katterman's

Eleventh and Twentieth Causes of Action.

Additionally, during oral argument Mr. Katterman agreed to dismiss Chief Winder from

all causes of action.  (*See also* Opp'n 9-10, ECF No. 57 (conceding that discovery has not

produced facts necessary to establish supervisory liability claim against Chief Winder).)  As a

result, the Court DISMISSES Chief Winder.  Similarly, Mr. Katterman consented to dismissal of

Salt Lake County and Salt Lake County Sheriff from the case because no evidence suggests any

involvement of Salt Lake County.  (*Id.* at 11.)  Therefore, the Court also DISMISSES Salt Lake

County and the Salt Lake County Sheriff.  At oral argument, Mr. Katterman's counsel also

agreed that the Court may dismiss Officers Gleue and Angell.  Therefore, the Court DISMISSES

all claims against Officers Gleue and Angell.  Furthermore, Mr. Katterman makes no claims

regarding any unidentified individuals, that is the John Does 1-15, and the Court DISMISSES

claims against them.

Given these dismissals, only Officer Barrett and UPD remain as Defendants.  Officer

Barrett and UPD argue none of the remaining claims withstands summary judgment, and even

presuming all disputed facts in favor of Mr. Katterman they are entitled to judgment as a matter

of law.

Mr. Katterman makes essentially three claims.  First, Mr. Katterman accuses Officer Barrett of violating his Fourth Amendment protection against excessive force when Officer Barrett deployed his police dog, Vortex, to find and seize Mr. Katterman.  (Opp'n 4-9, ECF No. 57.)  Mr. Katterman seeks damages from Officer Barrett for this violation pursuant to 18 U.S.C. § 1983.  (Compl. 22, ECF No. 2.)  Mr. Katterman agreed at oral argument that his First, Second, Third, and Fourth Causes of Action merge into this single claim.  Second, Mr. Katterman seeks to hold UPD liable for damages, pursuant to 18 U.S.C. § 1983, because it adopted a police dog deployment policy that permitted the unconstitutional seizure of Mr. Katterman.  (Opp'n 10-11, ECF No. 57.)  Mr. Katterman proceeds under two theories:  supervisory and final policy maker liability.  (Compl. 42-44, ECF No. 2.)  Third, Mr. Katterman argues Officer Barrett and UPD have negligence liability authorized by Utah Code section 18-1-1 for negligently deploying Vortex.  (*See* Opp'n 12-15, ECF No. 57.)  As clarified at oral argument, this claim encompasses Mr. Katterman's Fifth, Seventh, and Thirteenth Causes of Action.

Having carefully considered the parties' memoranda, the record in this case, oral argument, and the law, viewing all facts in the light most favorable to Mr. Katterman, the Court GRANTS Officer Barrett summary judgment on the § 1983 claims against him.  The Court will certify the question about Utah Code section 18-1-1 claims against Officer Barrett and UPD to the Utah Supreme Court and thus declines to rule on summary judgment at this time.  The Court further GRANTS summary judgment for UPD on the supervisory liability claim and DENIES summary judgment for UPD on the municipal liability claim.

## II.  STANDARD OF REVIEW

Courts grant summary judgment when the pleadings, the discovery materials on file, and any affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Only facts "essential to the proper disposition of a claim" qualify as material.  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).  "'[W]here the non moving party will bear the burden of proof at trial on a dispositive issue' that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  When applying the summary judgment standard, "[t]he factual record and reasonable inferences therefrom are viewed in the light most favorable to the [nonmoving] party." *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998).

### III. FACTUAL BACKGROUND

The Court considers the following facts in determining the Motion for Summary Judgment.  All facts come from parties' briefings and accompanying exhibits.  The undersigned resolves all disputed issues of material fact in favor of Mr. Katterman.

On May 19, 2012, James Katterman went to a bar in Magna, Utah, had a few drinks, and returned home.  (Reply Mem. in Supp. of Defs.' Mot. for Summ. J. (Reply) Undisputed Fact No. 4, ECF No. 63.)  Sometime between midnight and 1:00 a.m., then May 20th, Mr. Katterman began arguing with his significant other, Cindy Singley, with whom he lives.  (*Id.* No. 8.)  The argument took on some physical dimension.  (*Id.*)  Ms. Singley hand-wrote in the Police Report that night, "We had an argument and he put his hands on me and pushed me and tore my shirt and I just wanted the abusive relationship to stop so I called the police."  (Police Report, Exh. 5, ECF No. 56-6; *see* Reply Undisputed Facts No. 8, ECF No. 63.)  At oral argument, counsel for Officer Barrett and UPD acknowledged that no one remembers whether Ms. Singley gave this

4

statement to the Officers before or after the search for Mr. Katterman began.  When asked about

the statement during her deposition, Ms. Singley stated, "[y]eah, I wrote it, and I don't know

why I – I have no idea why I worded it that way because this is the first argument me and James

have ever been in, so I have never had an abusive relationship with him, so I don't know why I

worded it like that."  (Reply Undisputed Facts No. 8 (quoting Singley Dep. 33-34, Exh. 4, ECF

No. 56-5), ECF No. 63.)

Sometime after the argument began, Ms. Singley left the house and went to the

neighbor's house across the street where she called the police.  (*Id.* No. 9.)  UPD learned of Ms.

Singley's 911 call at approximately 12:47 a.m.  (*Id.* No. 10.)  The Officers knew Mr. Katterman

did not know Ms. Singley had called the police.  (Computer Aided Dispatch Log, Exh. 8, ECF

No. 56-9.)  Officer Kyle Gleue arrived first and spoke with Ms. Singley.  According to Officer

Gleue's Declaration, he recalls,

> 5. When I arrived on scene, I met with Cindy at a neighbor's house. She was in
> the neighbor's living room and was in tears. I noticed that the neck of her shirt
> was stretched out and ripped and her neck had some redness on it… .
>
> 6. Cindy told me that she and her live-in boyfriend James had gone to a bar. …
> At home, they started arguing in the living room. Cindy told James she didn't
> want to deal with this anymore and went into the bedroom where she laid
> down on the bed.  James followed her into the bedroom and climbed on top of
> her. He with his leg to the side of her and his arm across her neck… .
>
> 7. Cindy gave me permission to enter her home … and gave me a set of keys to
> the house.

(Kyle Gleue Decl., Exh. 6, ECF No. 56-7); *see also* Reply Undisputed Facts Nos. 8, 11 & Defs.'

Resp. to Pl.'s Add'l Undisputed Facts No. 2., ECF No. 63; Singley Dep. 39-40, 43-48, Exh. 4,

ECF No. 56-5.)[3]  Photographs of Ms. Singley from the night in question show a tear near the

---

[3] The Court finds Mr. Katterman submitted evidence from which a reasonable jury could find the
facts occurred as stated in this paragraph.  The Court omitted facts Mr. Katterman disputed with

collar of Ms. Singley's shirt created by Mr. Katterman and redness on her neck and arm.  (Mot. Summ. J. 11-12, ECF No. 56; Reply Undisputed Facts No. 12, ECF No. 63.)  UPD dispatched Officer Barrett, a canine officer on duty in Magna, Utah, to the scene.  (Reply Undisputed Facts No. 14, ECF No. 63.)

Officer Barrett became a canine handler in August of 1995 after graduating from the canine program at Utah's Peace Officer Standards and Training (POST).  (*Id.* No. 15.)  At POST, Officer Barrett and his dog, Vortex, went through extensive, continual training.  (*Id.*)  The pair had been deployed over 130 times, with approximately 10-15% of those deployments resulting in apprehension of a suspect by Vortex.  (*Id.*)

While en route Officer Barrett used his vehicle's computer, his Mobile Data Terminal (MDT), to identify the suspect as James Katterman.  (*Id.* No. 16.)  Officer Barrett's MDT identified Mr. Katterman as a 59-year-old, 260 pound, 6'03" male, with drug abuse problems and alcohol and/or drug addiction, who belongs to the Sundowners motorcycle club/gang, and had an "obstruction of justice court" arrest in 2010.  (*Id.* No. 17 (citing Mot. Summ. J. 13-15, ECF No. 56).)  While not shown in the screenshots, Officer Barrett recalls his computer additionally indicated Mr. Katterman had an outstanding warrant in Utah for felony driving under the influence (DUI).  (*Id.* No. 18 (citing Barrett Dep. 155-56, Exh. 7, ECF No. 56-8).)  Officer Barrett confirmed the outstanding warrant over the radio at 1:04 a.m.  (*Id.* No. 19.)  Officer

---

evidentiary support and nonrelevant facts.  Specifically, Mr. Katterman submitted deposition testimony from Ms. Singley denying she said anything about being choked, the Hell's Angels, or wanting Mr. Katterman arrested.  (Singley Dep. 43-48, ECF No. 56-5.)  Officer Barrett and UPD ask the Court to discount Ms. Singley's testimony because she stands to gain financially if Mr. Katterman prevails.  (Reply Undisputed Facts No. 12, ECF No. 63.)  However, the Court cannot weigh evidence on a motion for summary judgment.  *First Sec. Bank v. Pan Am. Bank*, 215 F.3d 1147, 1154 (10th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Barrett also noted a non-extraditable burglary warrant for Mr. Katterman issued in Washington State.  (*Id.* Nos. 18, 25.)

Arriving at the scene Officer Barrett spoke with Officer Gleue.  (*Id.* No. 21.)  Officer Gleue indicated that he believed Mr. Katterman remained inside the home.  (*Id.*)  Officer Barrett went to Ms. Singley's house and saw an open back door and door to the freestanding garage nearby.  (*Id.* No. 22.)  Officer Barrett observed "quite a few beer bottles strewn about on the [patio] furniture."  (*Id.* (quoting Barrett Dep. 72, Exh. 7, ECF No. 56-8).)  Based on the beer bottles Officer Barrett concluded he "might be dealing with people here who were under the influence of alcohol."  (*Id.*)  Nothing indicated Mr. Katterman had a weapon.  (Reply Defs.' Resps. to Pl.s' Add'l Undisputed Facts No. 18, ECF No. 63.)

After discussing the situation with Officers Gleue and Angell, Officer Barrett then searched the home with Vortex.  (Reply Undisputed Facts Nos. 25-26.)  Officer Barrett did not find Mr. Katterman in the house and began to search the neighborhood.[4]  (*Id.* Nos. 28, 34-35; Defs.' Resps. to Pl.'s Add'l Undisputed Facts No. 20, ECF No. 63.)  While in Ms. Singley's backyard, Officer Barrett and Officer Gleue encountered Brian Tabor, a next-door neighbor. (Reply Undisputed Facts No. 36, ECF No. 63.)  Mr. Tabor told the officers he had not seen anyone exit the back door.  (*Id.*)  The Officers instructed Mr. Tabor to reenter his home, and Mr. Tabor complied.  (*Id.*)  Officer Barrett left the backyard and began searching the neighboring yards and driveways.  (*Id.* No. 37.)

---

[4] The Court finds Mr. Katterman submitted evidence from which a reasonable jury could find Officer Barrett gave no warnings about his presence or the presence of a police dog.  (Katterman Dep. 82, ECF No. 56-3.)  Officer Barrett and UPD invite the Court to discount Mr. Katterman's testimony because of his intoxication.  (Reply Defs.' Resp. to Undisputed Add'l Facts No. 20, ECF No. 63.)  On summary judgment the Court does not weigh evidence, *First Sec. Bank*, 215 F.3d at 1154, and thus declines to do so.  Therefore, the Court omitted facts regarding alleged warnings.

After circling the block, the Officers passed Mr. Tabor's residence.  (*Id.* No. 38.)  Vortex alerted at the foot of the driveway, indicating to the Officers that something further down the driveway interested him.  (*Id.* No. 40.)  The Officers saw a red vehicle parked in the driveway, several large bushes near the driveway, and a solid brick wall obstructing the view between Mr. Tabor's property and the adjoining residence to the north.  (*Id.* No. 39.)  Officer Barrett did not give any warning before sending Vortex down the driveway.  (*Id.* No. 41.)

Officer Barrett then let Vortex go down the driveway on leash between the vehicle and the bushes.  (*Id.* Nos. 42-43.)  Vortex passed a large bush, went into the bush, and began to pull on something.  (*Id.* No. 44.)  Officer Barrett announced, "Come out.  Show me your hands. Show me your hands.  Come out of the bushes.  Show me your hands."  (*Id.* (quoting Barrett Dep. 89, Exh. 7, ECF No. 56-8).)  Vortex apprehended Mr. Katterman by biting his leg; Officer Barrett began to assist Vortex by pulling on the leash.  (*Id.* Nos. 44-45.)  Vortex took Mr. Katterman by surprise, and Mr. Katterman tried to get away from the dog who "was chewing [his] leg off."  (*Id.* No. 47 (quoting Katterman Dep. 91, Exh. 2, ECF No. 56-3).)  Once Vortex had Mr. Katterman completely out of the bushes, Officer Barrett saw Mr. Katterman's hands, informed Officer Gleue that Mr. Katterman was unarmed, and instructed Vortex to release.  (*Id.* No. 44.)  Vortex had hold of Mr. Katterman's leg for less than one-minute total.  (*Id.* at No. 55.)

Also relevant to Mr. Katterman's claims:  in 2007, UPD expanded the scope of situations in which an officer may deploy a police dog to apprehend a suspect.  (Reply Defs.' Resp. to Pl.s' Add'l Undisputed Facts No. 14, ECF No. 63.)  Specifically, UPD changed its policy from only allowing dog deployment for violent felonies to all felonies and some Class A misdemeanors, including those that involved violence.  (*Id.*)  According to Officer Barrett, this expansion coincided with the switch from a bite and hold technique, where the officer instructs a police dog

to find and bite a suspect, to a bark and hold technique, where the officer instructs a police dog to

find and bark at a suspect.  (*Id.* (citing Barrett Dep. 42-43, Exh. 2, ECF No. 57-2).)  The bark and

hold technique does not apply when the officer has a dog on leash.  (*Id.* No. 8 (citing Barrett

Dep. 148, Exh. 2, ECF No. 57-2).)  When on leash, UPD dogs will bite and hold a suspect if

their officer lets them.  (*Id.* Nos. 8-9 (citing Barrett Dep. 149, Exh. 2, ECF No. 57-2; Lovato

Dep. 30-31, Exh. D, ECF No. 63-4).)

## IV. DISCUSSION

### A.  Qualified Immunity Shields Officer Barrett from Fourth Amendment Liability

#### i.     Qualified Immunity Standard and Mr. Katterman's Burden

Among other claims made in the Complaint, Mr. Katterman alleges violation of Liberty

Interests (First Claim), Excessive Force (Second Claim), Due Process (Third Claim), and

Unlawful Detention, Arrest, and Seizure (Fourth Claim).  (Compl. 19-27, ECF No. 2.)  At the

hearing held January 31, 2017, counsel clarified that Mr. Katterman concedes his Unlawful

Detention, Arrest, and Seizure Claim and that the three remaining Fourth Amendment claims

reduce to a single claim – Officer Barrett used unreasonable force against Mr. Katterman under

the Fourth Amendment.

Officer Barrett asserts qualified immunity from Mr. Katterman's § 1983 claims.  (Mot.

Summ. J. 43-56, ECF No. 56.)  To defeat qualified immunity and avoid summary judgment, a

plaintiff must put forth evidence to show, "(1) the defendant violated a constitutional right and

(2) the constitutional right was clearly established."  *Morris v. Noe*, 672 F.3d 1185, 1191 (10th

Cir. 2012).

In determining the first prong, whether Officer Barrett violated Mr. Katterman's

constitutional right, the Court must analyze "whether the officers' actions are 'objectively

reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312–13 (10th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  The Court evaluates reasonableness under the totality of the circumstances, using factors such as, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 1313 (citing *Graham*, 490 U.S. at 396).  Reasonableness does not require the officers to take only the least restrictive course of action. *Thomas v. Durastanti*, 607 F.3d 655, 665 (10th Cir. 2010).  Objective reasonableness depends on the facts and circumstances facing the officer, not the officer's subjective motivation or intentions. *Thomson*, 584 F.3d at 1313 (citing *Graham*, 490 U.S. at 397).  "[T]he Court considers only the facts that were knowable to the defendant officers." *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 550 (2017); *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) (requiring court to consider a reasonable officer's position at the time).  If a plaintiff provides evidence that the officer did not use an objectively reasonable level of force, he meets the burden of the first prong for summary judgment purposes.  The analysis then turns to the second prong – whether the case law clearly establishes the constitutional right. *Cordova*, 569 F.3d at 1192.  "Even if [a plaintiff's] Fourth Amendment rights were violated, [the] [o]fficer … is still entitled to qualified immunity if the right was not clearly established." *Id.*

A constitutional right becomes "clearly established" when there is a "Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1114-15 (10th Cir. 2007) (en banc)).  "When a clearly established right depends on the application of a general principle of

law to a particular set of facts, '[the principle's] contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Cordova*, 569 F.3d at 1192 (quoting *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008)).  In other words, novel actions may still violate clearly established rights so long as existing case law puts the official on notice.  *Weise*, 593 F.3d at 1167 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also Hope* 536 U.S. at 741 ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question…") (quoting *United States v. Lanier*, 520 U.S. 259, 269 (1997)).  However, in the case of certain conduct, the universe of case law may prove inconclusive, vague, or unhelpful.  *See Cordova*, 569 F.3d at 1193 (finding law regarding deadly force against fleeing suspect vague and thus not clearly established).  Under those circumstances, the violation does not qualify as clearly established, and qualified immunity shields the officer from liability.  *Id.*

If a plaintiff successfully demonstrates violation of a clearly established constitutional right, the burden shifts to the defendant who must prove that no disputed material facts remain that would defeat the qualified immunity defense.  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).  If a fact relevant to the immunity analysis remains unresolved, the court should not grant summary judgment based upon the qualified immunity defense.  *Id.*

### ii.    Degree of Force Violated Mr. Katterman's Fourth Amendment Rights

Mr. Katterman argues the use of Vortex to seize him constituted excessive force.  In determining whether the officer acted reasonably in using the degree of force employed, the Court must consider the totality of the circumstances.  *Thomson*, 584 F.3d at 1313.  The Court must "balance the following factors:  'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight.'" *Id.* (citing *Graham*, 490 U.S. at 396).  In considering this balance, the Court takes into account the Officer's need to make split-second decisions in difficult circumstances.  *Id.* (quoting *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005)).

The Tenth Circuit has held that the *Graham* factors least support the use of force against "nonviolent misdemeanants who do not flee or actively resist arrest."  *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007).  By contrast, release of a police dog in a residential neighborhood to apprehend an intoxicated man who had threatened his wife with a gun, threatened suicide, left the home with a gun, and made a veiled threat against the officers did not constitute excessive force.  *Thomson*, 584 F.3d at 1310-11, 1317.[5]  Mr. Katterman's circumstances fall somewhere between these two cases.

The Court first addresses the severity of the crime.  A reasonable officer on the scene would have had evidence of a domestic dispute that became physical, supported by Ms. Singley's statements and torn shirt.  (Reply Undisputed Facts No. 8, ECF No. 63; Mot. Summ. J. 11-12, ECF No. 56.)

Both parties agree that Utah law requires the arrest or citation of a suspected domestic violence perpetrator in the following situations:

> (1)  The primary duty of law enforcement officers responding to a domestic violence call is to protect the victim and enforce the law.
>
> (2)(a) In addition to the arrest powers described in Section 77-7-2, when a peace officer responds to a domestic violence call and has probable cause to believe that an act of domestic violence has been committed, the peace officer shall arrest without a warrant or shall issue a citation to any person that the peace officer has probable cause to believe has committed an act of domestic violence.

---

[5] *Thomson* directly addressed the issue of whether use of a police dog could constitute deadly force and found it did not under the circumstances of the case.  584 F.3d at 1315.  Mr. Katterman does not contend Vortex's deployment constituted deadly force.

> (b)(i) If the peace officer has probable cause to believe that there will be
> continued violence against the alleged victim, or if there is evidence that
> the perpetrator has either recently caused serious bodily injury or used a
> dangerous weapon in the domestic violence offense, the officer shall arrest
> and take the alleged perpetrator into custody, and may not utilize the
> option of issuing a citation under this section.

Utah Code Ann. § 77-36-2.2.  The responding Officers had no evidence of "serious bodily harm

or [use of] a dangerous weapon," meaning the statute did not compel Officer Barrett to arrest Mr.

Katterman.  However, the statute clearly says that the Officers could have arrested Mr.

Katterman without a warrant given "probable cause to believe [the suspected perpetrator] has

committed an act of domestic violence."  Utah Code Ann. § 77-36-2.2(2)(a).  Taking the facts in

Mr. Katterman's favor, a reasonable officer would find the alleged crime on the lower end of

severity but a violent crime, nonetheless.

The next category of facts addresses the second *Graham* factor:  whether Mr. Katterman

posed an immediate safety threat to the officers or anyone else.  Officer Barrett's MDT reported

that Mr. Katterman had two outstanding warrants – one felony DUI warrant in Utah and another

non-extraditable burglary warrant in Washington State.  A non-extraditable warrant raises fewer

concerns because the issuing agency determined the charged conduct did not call for extradition.

Furthermore, a DUI warrant, even for a felony DUI, does not suggest violence by the accused.

Additionally, in this case no facts suggest Mr. Katterman tried to drive when he left the home

after the fight.  Thus, a reasonable officer would not have thought Mr. Katterman posed a danger

from driving under the influence.  The MDT reported Mr. Katterman's occupation as disabled

based on drug/alcohol abuse, and a reasonable officer would have suspected possible alcohol

intoxication given Mr. Katterman and Ms. Singley had gone to a bar earlier in the evening and

the empty beer bottles in the backyard.  In considering the context further, this incident took

13

place in the dark, early morning hours in a residential neighborhood.  The MDT also reported Mr. Katterman belonged to the Sundowners motorcycle club, an organization the police consider a gang, although Mr. Katterman disagrees with that characterization.  (*See* Katterman Dep. 20, Exh. 2, ECF No. 56-3.)  The Officer also learned the fifty-nine year old Mr. Katterman weighed 260 pounds and stood 6 foot 3 inches tall.  The screen also read, "CAUTION: Drug Abuse."  A reasonable officer would perceive a possibility of continued abuse of Ms. Singley, while also recognizing that for the moment she was safe at a neighbor's house.  No evidence indicated Mr. Katterman might have a weapon.  As for his own safety in the apprehension, a reasonable officer would have perceived a risk that Mr. Katterman was intoxicated, agitated, and large.  Given Mr. Katterman's age, unarmed status, and the presence of two other officers and a police dog, a reasonable officer would not have harbored significant concern for his own safety but would have nonetheless stayed alert to the potential for circumstances to change.

The Court next analyzes the final *Graham* factor, whether Mr. Katterman actively resisted or fled arrest.  Construing the facts in favor of the nonmoving party, Officer Barrett gave no audible warnings regarding Vortex or the officers' presence before deploying Vortex.  The home was empty, and the back door and the garage door were ajar, indicating Mr. Katterman had left.  No evidence submitted indicates that the officers used either their lights or sirens.  No undisputed fact suggests that Mr. Katterman knew of the police presence or their search for him or even that Ms. Singley had called them.  That Mr. Katterman left the house, presumably sometime after Ms. Singley departed, does not automatically lead to the conclusion that he sought to avoid arrest.  Under the facts asserted by Mr. Katterman, a reasonable officer could not conclude Mr. Katterman had fled or resisted arrest.

Of note, in his deposition, Officer Barrett provides a hypothetical where he believes release of Vortex off leash to "bark and hold" would prove the better course of action.  (*See* Barrett Dep. 29, ECF No. 57-2.)  The situation he describes resembles the situation at issue, if one believes Mr. Katterman's evidence.  Specifically, both scenes presented dark, cluttered spaces with the potential for ambush.

The circumstances of this case present marked differences from *Thomson*, where the Tenth Circuit found the release of a police dog did not reflect unconstitutional excessive force. 584 F.3d at 1316-17.  In *Thomson*, the suspect posed a significantly larger threat to the officers and public.  The police knew the suspect had a gun and had threatened his wife with the gun.  *Id.* 1309-10.  Additionally, before the police dog in *Thomson* located the suspect, the suspect told an officer via cellphone, "if he did not want his officers to get hurt, he should have them leave the area." *Id.* at 1310.  Under these facts, a reasonable officer would assume the suspect intended to avoid arrest actively, wanted to harm himself and his wife, had the means to do so, and would harm the police if they continued to pursue him.

Mr. Katterman's case also differs from another case involving a claim of excessive force in the use of a police dog, *Marquez v. City of Albuquerque*, 399 F.3d 1216 (10th Cir. 2005).  In *Marquez,* the plaintiff appealed a jury verdict arguing that, "the evidence is such that the only rational conclusion is that [the officer] used excessive force in effectuating her arrest."  *Id.* at 1220.  The Tenth Circuit found that the evidence present at trial supported the conclusion that the officer acted reasonably in deploying the police dog.  The officer deployed his dog in the face of two fleeing robbery suspects, following a high-speed car chase, where he had no other officers to assist him.  *Id.* at 1221.  The officer testified at trial that one quarter to one half of all robbery

suspects are armed.  *Id.*  *Marquez*, like *Thompson*, presented the officer with a fleeing suspect with reason to believe the suspect had a weapon.

The Court finds the variations between *Marquez*, *Thomson*, and the present facts instructive.  Crucially, *Thomson* and *Marquez* both found police dog deployment when a potentially armed suspect actively evades arrest constitutional.  In both of these cases the third *Graham* factor, "whether [a suspect] is actively resisting arrest or attempting to evade arrest by flight," carried significant weight through well-established facts.  *Graham*, 490 U.S. at 396.

By contrast, the court in *Brown v. Whitman*, 651 F. Supp. 2d 1216, 1227 (D. Colo. 2009), found excessive force in a dog deployment case at the summary judgment stage.  In that case the officers used an off leash dog to apprehend the plaintiff while searching for two armed carjackers.  *Id.* at 1226.  The plaintiff emerged from sitting in her car in her driveway at night upon seeing the lights from an officer's flashlight.  *Id.*  As she tried to identify herself, the police dog bit the plaintiff and pulled her from her car without any warning.  *Id.*  The court found that without more compelling information about the governmental interests at stake, the city could not win summary judgment on the issue of a Fourth Amendment violation.  *Id.* at 1227.

Similarly, resolving all disputes of material fact in favor of Mr. Katterman, Mr. Katterman did not resist arrest or flee and had no warning that Officer Barrett was looking for him.  No evidence suggested Mr. Katterman was armed.  While Mr. Katterman presents an imposing figure, he was fifty-nine and alone.  Officer Barrett had police back-up and had no exigency in searching the bush.  *See accord Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994) (denying summary judgment in a police dog case where, among other factors, the situation did not force the officers "to make 'split-second judgments' in circumstances that were "rapidly evolving.");  *Becker v. City of Evansville*, No. 3:12-CV-182-WGH-TWP, 2015 WL 328895, at *8

(S.D. Ind. Jan. 26, 2015) (unpublished) (reasoning "[i]f officers may treat all suspects as armed until they confirm otherwise, the Fourth Amendment's protection against excessive force is no protection at all.").  Under these facts, this use of Vortex to seize Mr. Katterman violated the Fourth Amendment's prohibition against excessive force.

### iii.  Qualified Immunity Shields Officer Barrett from Liability Because the Violation was not Clearly Established

Having determined that, under a view of the facts most favorable to Mr. Katterman, Officer Barrett committed a constitutional violation, the Court next considers whether the right infringed upon was clearly established.  *Cordova*, 569 F.3d at 1192.  Ideally, a plaintiff would point to a specific Supreme Court or Tenth Circuit case, identify a guiding principle, and then explain how that guiding principle governs the officer's conduct under the facts of the case.  *See Weise*, 593 F.3d at 1167 (quoting *Cortez*, 478 F.3d at 1114-15).  In the absence of clear guidance from the Tenth Circuit, a plaintiff may establish a guiding principle using the "weight of authority from other courts."  *Id.*

Mr. Katterman's briefing gives an adequate explanation of the qualified immunity defense and a plaintiff's burden but falls short of meeting that burden.  In short, Mr. Katterman provides very little explanation of why the Court should consider the violation clearly established.  (Opp'n 8-9, ECF No. 57.)  Mr. Katterman distinguishes *Thomson* as to the first prong of qualified immunity analysis, arguing that while the use of a dog in that case may qualify as reasonable, the use here clearly does not.  *Id.*  Next, Mr. Katterman correctly concludes *Thomson* fails to provide a clear guiding principle for when deployment of a police dog would violate the Fourth Amendment.  *Id.*  However, Mr. Katterman falters at his next step when he reasons:

> Absent such an on-point case involving a police dog and sufficiently similar facts, the court must fall back on the general, and well-established, Fourth Amendment right that heightened force can be used in the apprehension of a suspect only when such force is objectively reasonable and supported by the totality of all the circumstances.

(Opp'n 9, ECF No. 57.)  This logic shirks the burden of proving a clearly established violation and instead collapses the analysis of the two prongs into one.  The second prong asks what cases, in this Circuit or any other, guide an officer's conduct under the circumstances (i.e., what guiding principle emerges from the case law to draw the constitutional boundaries).  *Cordova*, 569 F.3d at 1192.  Paraphrasing the Tenth Circuit, an officer can violate Fourth Amendment rights, and qualified immunity shields that officer from individual liability unless the case law clearly established those rights at the time of the use of force.  *Id.*  Under this two-part test, an action can violate the Constitution without qualifying as a clearly established violation.  The guiding principle Mr. Katterman relies upon – that actions must be objectively reasonable – answers whether an action violates the Constitution.  Objective reasonableness does not show whether the conduct in question violated a clearly established right.  To hold otherwise would merge the two-prong analysis into a single question.  "'[C]learly established law' should not be defined 'at a high level of generality.'"  *White*, 137 S. Ct. at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

Mr. Katterman has not met the burden of the second prong, and as a result, Officer Barrett retains qualified immunity from Mr. Katterman's Fourth Amendment claims.  Therefore, the Court GRANTS summary judgment to Officer Barrett on the § 1983 claim.

### B.  Supervisory Liability (Eighteenth Claim)

Mr. Katterman brings a supervisory liability claim against UPD, Salt Lake County, and Chief Winder.  (Compl. 42-43, ECF No. 2.)  Mr. Katterman consented to dismissal of Salt Lake

County and Chief Winder, and as a result, he can no longer maintain a supervisory liability cause of action.

Section 1983 allows for supervisory liability where a plaintiff can show "an affirmative link between the supervisor and the [subordinate's] violation." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010).  Tenth Circuit case law abounds with the need for "personal participation," "personal involvement," or "personal direction or knowledge," to establish supervisory liability.  *Id.*; *Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009), as amended (July 24, 2009); *Jenkins v. Wood*, 81 F.3d 988, 994-95 (10th Cir. 1996).  Post-*Iqbal* the personal involvement requirement became stricter.  *Cox v. Glanz*, 800 F.3d 1231, 1248-49 (10th Cir. 2015).  Without a named supervisor, Mr. Katterman lacks half of the necessary link.  *Dodds*, 614 F.3d at 1195.  Supervisory liability could impose liability on UPD but only if Mr. Katterman brought the charge against an employee of UPD in his "official capacity."  *See Brandon v. Holt*, 469 U.S. 464, 471–73 (1985) (distinguishing between suits against individuals in their official capacities and municipalities).  UPD could remain liable under the separate theory of municipal liability, as discussed in the next section.  *Id.*  Therefore, the Court GRANTS UPD summary judgment on the supervisory liability claim.

### C.  UPD's Potential Liability (Nineteenth and Twentieth Claims)

According to Mr. Katterman, the Court should deny UPD summary judgment because its "explicit adoption of policy directly led to the injuries suffered."  (Opp'n 10-11, ECF No. 57.) The Complaint alleges that UPD policy regarding "apprehension, seizure, search, and/or detention of suspects" using police dogs violated constitutional rights for which UPD has § 1983 municipal liability.  (Compl. ¶¶ 72, 75-76, 78, 183-88, ECF No. 2.)  Both sides agree that the standard for governmental entity liability requires:  (1) a constitutional violation and (2) a causal

link between the violation and a government policy or custom.  (Mot. Summ. J. 35-36, ECF No. 56 (citing *Whitewater v. Goss*, 192 F. App'x 794, 796–97 (10th Cir. 2006) (unpublished); *City of Canton v. Harris*, 489 U.S. 378, 385–86 (1989)); Opp'n xliii-xliv, ECF No. 57.)  "[W]hen execution of a government's policy… inflicts the injury [then] the government as an entity is responsible under § 1983."  *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978).  To survive summary judgment, the plaintiff must put forth evidence that the municipal policy "was the moving force behind the constitutional deprivation."  *See Myers v. Okl. Cty. Bd. Of Cty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998) (discussing municipal liability at trial).  To show the requisite degree of culpability a plaintiff must show a municipality's deliberate indifference. *Ware v. Unified School Dist.,* 902 F.2d 815, 819 (10th Cir.1990).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. … In most instances, notice can be established by proving the existence of a pattern of tortious conduct. … In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998), superseded by statute on other grounds, Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a), (citing *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407-10 (1997)).  Taking the facts as set forth above, the Court finds that Mr. Katterman has put forth evidence that could prove a constitutional violation occurred with Vortex's deployment.

UPD expanded the scope of situations where an officer may deploy a police dog to apprehend a suspect.  (Reply Defs.' Resp. to Pl.s' Add'l Undisputed Facts No. 14, ECF No. 63.) Specifically, UPD changed its policy from allowing dog deployment only for violent felonies to

allowing deployment for all felonies and some Class A misdemeanors.  (*Id.*)  Mr. Katterman

claims, that explicit policy change authorized the deployment of Vortex, and the previous policy

would have prohibited Vortex's use that night and prevented his injury.  (Opp'n 10-11, ECF No.

57 (citing Barrett Dep. 43, Exh. 2, ECF No. 57-2).)  Thus, the policy provided the moving force

behind his injury.

       According to Officer Barrett, this expansion coincided with the switch from the bite and

hold technique, where the officer instructs a police dog to find and bite a suspect, to the bark and

hold technique, where the officer instructs a police dog to find and bark at a suspect.  (Reply

Defs.' Resp. to Pl.s' Add'l Undisputed Facts No. 14, ECF No. 63 (citing Barrett Dep. 42-43,

Exh. 2, ECF No. 57-2).)  The bark and hold technique does not apply to a leashed dog.  (*Id.*

(citing Barrett Dep. 148-49, Exh. 2, ECF No. 57-2).)  Officer Barrett does not specifically name

the technique utilized when a dog is on leash but does agree it is "something akin to… bite and

hold."  (Barrett Dep. 149, Exh. 2, ECF No. 57-2.)  UPD reasons that because bark and hold only

applies when dogs are off leash, the policy change regarding the scope of dog deployment only

implicates off leash use of dogs.  When asked specifically about changes in the use of "K-9

force", Officer Barrett says, "[u]nder the bite and hold program, the bite and hold dogs were only

allowed to be deployed against violent defendants.  Under the bark and hold program, that use of

force was relaxed to all felonies and some Class A misdemeanors."  (Reply Defs.' Resp. to Pl.s'

Add'l Undisputed Facts No. 14, ECF No. 63 (citing Barrett Dep. 42-43, Exh. 2, ECF No. 57-2).)

When asked the difference between "find and bite techniques versus find and bark techniques",

another deposed Officer, Luis Lovato replied, "it's a term generally or broadly speaking of the

dog's behavior off leash."  (*Id.* No. 8 (citing Lovato Dep. 26-27, Exh. D, ECF No. 63-D).)

Some evidence supports UPD's interpretation of the facts – that Officer Barrett's discussion of the scope of deployable situations addressed only off leash deployment. However, other evidence supports Mr. Katterman's interpretation. Specifically, later in Officer Barrett's testimony, he speaks in terms of "use of K-9 force" and "deployment" without reference to on leash or off leash. (Barrett Dep. 45-49, ECF No. 57-2.) In addition, earlier in the deposition Officer Barrett explained, "the majority of Vortex's apprehensions were on lead." (*Id.* at 27.) Then, when Officer Barrett talks about dog deployments under the new expanded policy, he considers his years of experience with deployments without distinguishing between on leash and off leash. (*Id.* at 45-47.) Based on this testimony, a rational jury could find that the expanded scope policy applies to all police dog deployments, not simply those off leash. This change would have particular significance because all UPD dogs will bite suspects to detain them when deployed on leash. (Barrett Dep. 149, Exh. 2, ECF No. 57-2; Lovato Dep. 30-31, Exh. D, ECF No. 63-4.) The Court notes that a "K-9 Policy and Procedure Manual" appears to exist, (Barrett Dep. 7, ECF No. 57-2), but neither side submitted the Manual with its briefings. Thus, a disputed issue of fact exists as to the scope of the policy given the ambiguity in the testimony.

Similarly, based on Mr. Katterman's evidence, a rational jury could find the alleged crime falls into the violent misdemeanor category and not the violent felony category. UPD's old policy would have prohibited deployment of a dog for a violent misdemeanor. With the expanded scope of dog deployment, both on and off leash, a rational jury could find UPD acted with deliberate indifference to the "plainly obvious consequence" of the policy change. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 771 (10th Cir. 2013) (quoting *Brown*, 520 U.S. at 411). Specifically, deployment of on leash dogs in a wider category of cases would result in them biting more people. A plainly obvious consequence of the expansion was

that many of those "new" cases would not pass the *Graham* factors.  As proof of obviousness, one need only consider this predictable incident and then look to the number of deployments resulting in dog bites known to UPD.  (*See* Lovato Dep. 18-19, 26, ECF No. 57-3.)  As further evidence of obviousness, Officers Barrett and Lovato both acknowledge that they would and do deploy their dogs frequently against non-violent felony suspects.  (Lovato Dep. 42-43, ECF No. 57-3; Barrett Dep. 46, ECF No. 57-8.)  One could conclude that the nature of the policy change makes obvious the likelihood of unconstitutional seizures.  Therefore, a rational jury could find the change in official policy at UPD bears a relationship to, and was the moving force behind, Mr. Katterman's injuries.  Specifically, by directing officers to follow the new policy, UPD caused a predictable injury to Mr. Katterman.  "Accordingly, if the [policy] is unconstitutional as applied, the City is liable." *Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1280 (10th Cir. 2009).  Thus while the deployment complied with the policy at the time, a jury could find that the constitutional violation occurred because of UPD's policy change.  "'[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made among various alternatives' by city policymakers." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 390 (8th Cir. 2007) (quoting *City of Canton v. Harris,* 489 U.S. 378, 389 (1989)).  Here, sufficient evidence exists to support a finding of deliberate indifference by UPD in adopting its change of policy.  Under these circumstances, the Court DENIES UPD's Motion for Summary Judgment on the municipal liability claim.

The Court notes two arguments absent from Mr. Katterman's Opposition to Summary Judgment, but raised by Mr. Katterman's counsel during oral argument.  First, that UPD failed to train adequately both Officer Barrett to handle Vortex and Vortex to behave appropriately, and second, that UPD erred in failing to compare Vortex's history to that of other police dogs in the

department, specifically regarding bite frequencies between dogs.  The Court will not consider these arguments because it deems "[i]ssues raised for the first time at oral argument … waived." *Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 805 (10th Cir. 1998).  UPD's Motion unambiguously requested summary judgment on all claims before the Court.  (Mot. 4, ECF No. 56.)  As the non-moving party, Mr. Katterman bore the burden of "go[ing] beyond the pleadings" and establishing contested material facts to support his claims and survive UPD's Motion. *McKnight,* 149 F.3d at 1128 (quoting *Celotex,* 477 U.S. at 322).  Mr. Katterman did allege failure to train in his Complaint, as discussed in Part I above, but did not argue on its behalf in his Opposition, and the Court dismissed the claim.  Similarly, whether or not Mr. Katterman's bite frequency theory fits within one of the original causes of action, he did not argue a failure to adopt a policy of measuring bite ratios theory within his Opposition, and therefore waived the claim.

### D.  State Law Claims:  Negligence (Fifth Claim), Negligent Use of a K-9 (Seventh Claim), and Gross Negligence/Willful and Wanton Misconduct (Thirteenth Claim)

Mr. Katterman raises state law claims of Negligence, (Compl. 27-29, ECF No. 2 (5th Cause of Action)), Negligent Use of K-9, (Compl. 30-31, ECF No. 2 (7th Cause of Action)), and Gross Negligence/ Willful and Wanton Misconduct, (Compl. 37-38, ECF No. 2 (13th Cause of Action)).

During oral argument, Mr. Katterman clarified his argument that Utah Code section 18-1-1 authorizes each of these versions of liability.  In their Reply, Officer Barrett and UPD argue Mr. Katterman raises this statutory claim for the first time.  (Reply 49-50, ECF No. 63.)  The Court may treat new allegations raised for the first time in opposition to a Rule 56 Motion as an attempt to amend the complaint or may ignore it as an untimely amendment at the Court's

discretion.  *Bruner v. Baker*, 506 F.3d 1021, 1030 (10th Cir. 2007) ("Bruner's failure to raise this argument in either complaint allows the district court discretion to ignore the argument.").  Mr. Katterman's Complaint explicitly set forth a separate claim for negligent use of a dog, specifically putting Officer Barrett and UPD on notice that he claimed they had not employed Vortex in a reasonable manner.  (Compl. 30-31, ECF No. 2.)  While Mr. Katterman did not identify Utah Code section 18-1-1 in his Complaint, that code section explicitly applies to the state and any county, city, town, or peace officer who causes injury by not using a dog "reasonably and carefully."  "Reasonably" is the touchstone for any negligence claim. Moreover, Officer Barrett and UPD obviously anticipated the claim as they raised it in their Summary Judgment Motion.  (Mot. Summ. J. 63-64, ECF No. 56.)  The Court does not read the inclusion of the code section number as an amendment to the Complaint.

Officer Barrett and UPD argue in their Reply and at oral argument that the Utah Governmental Immunity Act (GIA) precludes any waiver of sovereign immunity outside the Act. (Reply 50, ECF No. 63.)  Utah Code section 63G-7-201(1) explicitly preserves governmental immunity for any injury arising from a governmental function "[e]xcept as otherwise provided in this chapter."  Mr. Katterman argues Utah Code section 18-1-1 clearly waives governmental immunity for negligent use of a police dog, and because the Utah legislature enacted it after it enacted the GIA, and the section is more specific than the GIA, the canons of statutory construction require section 18-1-1 to prevail in any contest.  (Opp'n 12, ECF No. 57.)  This Court finds section 63G-7-201 in conflict with section 18-1-1.

Given the conflict in state statute, that this issue is a matter of first impression, and that this issue cuts to the heart of state sovereignty, this Court will certify the question to the Utah Supreme Court.  *See* Utah R. App. P. 41.  Therefore, the Court declines to rule on Mr.

Katterman's Negligence/Negligent Use of K-9/Gross Negligence/Willful and Wanton Misconduct claim as available under Utah Code section 18-1-1 at this time.  The Court seeks the parties' input on the wording of the question for certification and ORDERS the parties to meet and confer within fourteen days of this Order, and to submit either joint or separate proposed questions within thirty days of this Order.

## V.  CONCLUSION

For the reasons stated above, the Court GRANTS Summary Judgment on all claims in favor of all Defendants with prejudice, with the exception of two claims.  The Court DENIES Summary Judgment for UPD on the § 1983 municipal liability claim, and this Court certifies a question to the Utah Supreme Court regarding applicability of Utah Code section 18-1-1.  The Court ORDERS the parties to meet and confer within fourteen days of this Order, and to submit either joint or separate proposed questions for certification within thirty days of this Order.

SO ORDERED this 31st day of March 2017.


BY THE COURT:


EVELYN J. FURSE
United States Magistrate Judge